JUAN M. LUCO AND JOSE LEANDRO LUCO, APPELLANTS, *v.* THE UNITED STATES.

A grant of land in California, purporting to have been made to one Jose de la Rosa, dated 4th of December, 1845, and purporting to be signed by Pio Pico as acting Governor, and countersigned by Jose Maria Covarrubias, secretary, adjudged to be false and forged.

THIS was an appeal from the District Court of the United States for the northern district of California.

The case is stated in the opinion of the court.

It was argued by *Mr. Benham.* and *Mr. Cushing* for the appellants, and by *Mr. Stanton* and *Mr. Della Torre* for the United States.

This case was remarkable for this one thing, amongst others: that in the trial below, Mr. Vance, a photographer, was examined, who attached to his deposition photographs of original documents, of impressions of genuine seals, and of the signatures of Pio Pico. These were exhibited during the argument in this court.

The counsel for the appellants contended that the evidence of Mr. Hawes and Raphael Guirado ought to be thrown out of the case, and then proceeded to argue the other points as follows:

1. To show why the claim was not presented in time, referring to the proceedings of Congress.

2. To show why the archives did not contain a notice of the claim, the reason being that the book of Toma de Razon was lost.

3. That the reason why the journal of the Departmental Assembly did not contain a record of the approval by that body was, that the journal produced was only the record of ordinary sessions, whereas the evidence shows this grant to have been approved at an extraordinary session.

4. That the testimony clearly establishes the possession of Rosa.

5. That the signatures were not forged. Upon this point the counsel remarked as follows:

The first testimony offered to prove a forgery is that of certain persons introduced as experts.

This testimony is inadmissible. At the time it was offered, Pio Pico had not been called to disprove his signature. He should have been called by the Government in the very beginning.

When the object is to disprove handwriting, the supposed maker is the best evidence, and must be called.

*Luco et al. v: United States.*

1 Phil. Ev., pp. 223, 224, 225.

Ibid., p. 43, and note, 918.

2 Phil. Ev., pp. 553, and note, 423.

3 Phil. Ev., pp. 1332 *et infra*, 1337.

Gurney *v.* Langlands, 5 Barn. and Ald., p. 330.

To say the least, it argues very ill for the conviction on the minds of the Government agents of the forgery, that they did not call Pio Pico.

[Then followed an examination of the testimony upon this point.]

6. That the seal was not false.

It is said that the seal on our grant differs from that on our certificate of approval, which latter is admitted, and proved by the Government's own witness, to be genuine; and that, inasmuch as Covarrubias says that he does not remember more than one seal, the impression on our grant is false.

We do not admit that the difference claimed to exist between the impression on the grant and that on the approval proves, by any means, that they were made by different stamps. These stamps were very rude; they were prepared for printing by greasing them, and holding them in the blaze of a candle until the soot and grease made a coloring matter; they were then applied to the paper, not by a machine which would give a just impression, but by the hand.

The differences visible in the two impressions consist only of minute differences between the spaces of parts of the objects on the impressions, or of differences in the relative angles of two or three of the letters of the inscription. All these differences are mechanical only, occasioned either by the want of uniform density and proportion in the lampblack and grease with which the impression is made, or in the want of precision or uniformity in the action of the hand in applying the stamp. There seems a greater difference as found occurring accidentally in all such impressions, and they may be produced experimentally at will with any stamp, either employing wax, or still more employing lampblack and grease.

It will be found, however, that Covarrubias does not say there was but one seal. It is true, he uses the words **imputed**

to him, but he is speaking of the legend of the seal, not of the stamp or die. At the time he was examined, nobody dreamed there was any difference between the impressions. An examination of his deposition shows he was speaking of the legend, and nothing else.

As to any deduction to be drawn from our not producing an impression from the archives similar to the one impugned, we protest against it. If the Government desire to predicate an argument upon the fact, if fact it is, that the archives present no impression like the one on our grant, it should have been proved. We do not admit that there is any ground of suspicion in this circumstance. Until it is proved that there was but one die, there is no reason to suspect the genuineness of the seal at all. It has the same legend and device the others have.

This seal is vindicated by the two other seals; they are admitted to be genuine, and the stamp that made them is proved to have been delivered into the hands of Fremont as early as the change of flags; the presumption is, that it has remained in the custody of the Government ever since.

The seal was not necessary upon these papers; it was not required by law. Covarrubias would not have put on a false seal when none was necessary. He is the man who made the grant. He says so, and it is in his handwriting. He knew the law. He was the very man to know exactly what was required. He had been Secretary of State.

It is affirmatively proved to be genuine. Larkin and Arenas both say it is genuine.

"After proving the seal, it will be presumed to have been properly affixed, and it will lie on the opposite party to show that it was affixed by a stranger."

Lord Brounker and Sir Robt. Atkyns, Skinner's Rep., p. 2, cited in 3 Phil., 1062, n. 717.

If it be supposed we found two blank papers with the genuine seals on them, we ask, why did we not write the grant and approval on them, and the petition and marginal decree on an unsealed one? This theory is forbidden by the fact that this is not the stamp seal, the habilitating seal, but it is

the Governor's seal put on acts in his office, to attest their genuineness as his, not to show the paper was lawful. If it be supposed that we had access to the genuine stamp, why not use it on all the papers?

Or if we forged the stamp, why not make a *fac simile?* We have as fine artists in San Francisco as there are in the world, and the seal is a very rude one.

7. That the description of Pico's office, written at the head of the grant, was not incorrect.

8. That the character of the witnesses has not been successfully impeached.

9. That the circumstance of other grants made about the same time not being approved till the next ordinary session of the Departmental Assembly, was owing to De la Rosa having so many influential friends, such as Alvarado, Castro, and Vallejo.

*Mr. P. Della Torre,* United States attorney for the northern district of California, for the United States.

This is a claim for confirmation, under the treaty of Guadalupe Hidalgo and the acts of Congress thereon, of a tract of land known as Ulpinas. The grant, it is alleged, was made by Pio Pico, the last Mexican Governor of California, to one Jose de la Rosa, on the 4th of December, 1845; and the case is conducted in the name of the Lucos, purchasers from De la Rosa. The grant is one of that class known as "sobrante" grants, being for the land remaining within a certain district, after satisfying the calls of senior grants. Its quantity is estimated at from fifty to sixty square leagues. The claim was not presented to the board of land commissioners within the time limited by the act of 1851, but in 1854 the claimants applied for and obtained a special act of Congress enabling them to submit it for adjudication. Claimants produce a grant in the usual form, purporting to be signed by Governor Pio Pico, countersigned by Jose Maria Covarrubias, and attested by the seal of the California Department; also, from their own possession, the original petition of Jose de la Rosa, with a marginal decree of the Governor, and a certificate that the

Departmental Assembly had approved the grant. Upon these documents, sustained by a great mass of parol testimony, they ask a confirmation. The United States oppose the claim.

It is one of the most important cases of its class which has yet claimed the attention of this court, both from the magnitude of the claim, and from the line of defence successfully adopted in the court below, and here renewed. No frivolous issue is raised; no technical rule of law is invoked, to defeat substantial rights; no attempt is made to force rules adapted to other circumstances into strange meanings, in order to wrest private property from the citizens of a subjugated province. Nothing of the sort. This grant and the papers connected with it are denounced as false and simulated. Forgery is the charge, and, by consequence, perjury; for how can the two be disconnected?

And the cause will be fully argued, without any surprise to the claimants. The charges now made are the same as those made in the District Court. The court will observe, that such matters as are specially intended to affect the integrity of the grant, such as the proofs drawn from the silence of the archives, the photographic exhibits to display the forgery of the Governmental seal of the Department of the Californias, and the falsity of the signatures, were all put into the record below, after the strictest form of legal requirement, and the claimants had abundant opportunity to rebut them, if they could. No other record will be appealed to, except such as the appellants have themselves brought, and very properly brought, into the case, for the proof of historical facts, and of such other public matters as by well-settled rules the court of itself would take judicial notice.

The issue before the court, then, is, whether the documents of title now produced, under sanction of a private act of Congress to enable them to be produced, supported by an imposing array of testimony, by a crowd of witnesses, certified and sworn to by officers formerly high in honorable position under the Mexican Government, are or are not the result of criminal contrivance, and the work of the criminal hand. It would be idle to contend that the positions of the United

States are compatible with the good fame and truth of many of the witnesses for the claim. The court will have to weigh the veracity of witnesses, directly, positively testifying in favor of the claim, against facts and circumstances which sternly and out of all doubt declare its falsity. From the painful nature of the duty already performed in this regard, the counsel is furnished with a standard to estimate how distasteful may be this task; still, the case requires it to be done. But, as the argument of these matters of fact will take a wide range, it is hoped that, as some compensation, it will be found that the discussion will enable the court to lay down certain rules, by which the validity of California land claims may in future be certainly and readily tested.

There is an interest which in this and many other California cases cannot be overlooked—the interest of bona fide settlers. The Government of the United States contests these cases for the benefit ultimately of that class. It acquires territory, not that it may become and remain a vast land owner, but that the acquired territory may be thrown open to its citizens, for their occupation in moderate quantity, in aid of a public policy so well settled that this court on all proper occasions feels bound to carry it out. And the rights of pre-emptors can be worked out only under the guardianship and in the name of the Government, as they are not allowed to appear and defend in person. It cannot be conceded, as contended, that their rights should be altogether ignored, nay, even their claims rebuked. For that class of men, calling themselves settlers, who intrude upon land in despite of law, or in speculation upon title, there can be but one just feeling; the Government can have no care for their imaginary interests. But vastly different is the case with those who, as in the present instance, go upon the land in accordance with an invitation from the Government, in perfect good faith, not only without notice of any adverse claim, but most, if not all of them, after active inquiry and full information that no private claim had ever been made or heard of. The rights of such men must be not only respected, but protected by a just Government. They are the people who have carried our laws, institutions, and all that make up

an empire, into the wilderness, and subdued it to the purposes of civilization; who, to reach this spot where they were bidden by l.w, have tempted the dangers of two oceans, or traversed vast spaces of desert, cut off from their old homes by savage mountains and barbarous tribes. They are entitled to regard and protection.

At the first blush of this case, two circumstances are prominent:

First. The extent of this grant, its quantity being so much beyond the colonization laws, and being made to such a man as De la Rosa.

Second. The late date at which it has been made known to the public.

As to the first. The grant is for a tract of land contained within certain boundaries. Its quantity is about sixty leagues, whilst the granting power of the Governor was restricted to eleven leagues, by the rules of Mexican colonization, with which the court is so familiar that they need not be cited. Under any circumstances, would the court respect this usurped power? It seems to be supposed that some of the cases arising under the treaties for the acquisition of Louisiana and Florida furnish precedents by which this grant may be supported. But not so. It is true that in some of those cases the court fixed no limits to the power of the Spanish Governor in making grants. Yet the reason assigned is conclusive. The Spanish Governors represented the royal personage, an unlimited monarch; and any exercise of authority on their part was to be referred to, and fed by, the fulness of the powers of him whom they represented. Their acts were done as by him, and were valid unless abrogated by his will. Dealing with the royal domain, if the Crown of Spain was content with its disposal, who was to complain? Hence this court, with perfect logic, has raised every presumption allowed by law to sustain the acts of the colonial Governors of Spain. But the case is widely different when we come to examine the acts of a Governor of a Mexican Territory or Department. Whatever disturbances there may have been to the idea, Mexico for many years has professed to be a constitutional republic, has so held

herself out to the world, has been so recognised by our own and all other Governments dealing with her, and must therefore be so regarded by this court in any judicial examination of the system of law prevailing in any portion of her territory prior to our acquisition of it. When the question turns upon the validity of any acts of her officers, they must be submitted to the same tests as those by which the acts of our own officers are tried. As with us, the great leading rule must be, that when an officer does an act purporting to bind his Government, the first step in proof of its validity is to show his authority to bind the Government. Until this be done, the act is held void as to the Government. In an unlimited Government, the power may be presumed from the act; the authority, from its exercise. But in a limited Government, of a written constitution and laws, where no power exists in public agents save what is specially delegated, the existence of the power must first be established *aliunde*, before we can proceed to examine the effect of its exercise.

Now, we are not referred to any regulation, decree, or usage, of Mexico, to any law, written or unwritten, by which the Governor of a Department was authorized to grant more than eleven leagues of land to one individual. On the contrary, we assert, none such can be adduced.

But even disregarding the effect of the want of power in Governor Pico to make this excessive grant, let us examine its probability as a question of fact. Is it at all probable that a Governor, when acting under his oath of office, with all the sanctions that attend such position, would grant sixty leagues of land without shadow of authority, and that, too, by an instrument in which he recites (as is done in this title) the law of 1824 and the regulations of 1828 as conferring the power by virtue of which he acts, whilst they in terms expressly forbid the act? Still further: is it likely he would have usurped this power for the benefit of "Don Pepe," the household jester of General Vallejo, who, living with the profusion and bounty of semi-barbaric pomp, kept such an appendage to his establishment? For this position does the record assign to Jose de la Rosa, the alleged grantee.

Nor can it benefit the appellants, that their counsel in this court have suggested that it was perhaps intended that the grant should be valid for only eleven leagues. It is an ingenious after-thought, and may show the skill of counsel, but it comes too late. The original alleged petition of De la Rosa to Governor Pico asks for all the land within certain limits; the " titulo " of Governor Pico grants all the land so asked; the deed of De la Rosa to the Lucos conveys the same; their petition in the court below claims the same; the cause was urged for the whole tract; evidence was introduced to that end; and it is in this court that, for the first time, there is any intimation of a smaller quantity being asked.

This consideration of the antecedent improbability of such a grant raises, to say the least, gravest doubt of its genuineness.

Next, as to its late publication.

The doubt caused by the first consideration is strengthened and raised almost to a certainty by the next strange feature of this case—the length of time and the circumstances under which the fact of a grant was kept concealed. The influx of American settlers had, from the year 1849, given great value to these lands; had placed them in worth, as they were in extent, on an equality with a principality; yet De la Rosa kept the secret of his ownership. He remained a pauper and a dependant, as he had always been; and with titles to an estate of enormous value, he is silent and content with his poverty. Pioneer after pioneer came to his neighborhood, and inquired after the grants and the vacant lands of the vicinage, yet no pretence of ownership is heard of. Finally, the United States officers, after diligent inquiry, fail to discover any claimant, and survey the lands as vacant. It is not until the year 1853, when the land is covered with the abodes of those whose industry has given it its value, that this most extraordinary grant is heard of. It is contrary to all ordinary rules of human conduct, that De la Rosa should have acted as he did, had he all that time been the owner of an estate of such gigantic dimension.

Taking in connection these two great improbabilities, and

in the absence of even plausible explanation, a court might well hesitate to give its belief to the story told, that such a grant was made under such circumstances.

Yet this view is not sufficient. The United States in this, from which results may be deduced affecting many other cases, intend absolute certainty, so far as that can be predicated of the examination of human testimony. Indeed, it is most desirable that the charges made below may either be entirely dissipated, and those implicated restored to their fame and credit, or that the truth be made so plain that the court will pronounce it proven.

It is proposed, therefore, in the order of this argument, to examine first the parol testimony, especially that adduced to sustain the claim; and after showing its utter unreliability. next to demonstrate, by proof drawn from the archives of California, that the whole fabric of the case is composed of glaring forgeries.

A single remark may be premised. Counsel have demanded of the United States attorney a theory as to the time and circumstances of the forgery, if it be one. But the United States are not bound to present or prove any such theory; it is enough if the existence of the grant, at the time of its alleged date, is shown to be incompatible with a state of facts demonstrated to be true. The claimant in a case like this, when all the actors in the affair are still living—the Governor who made the grant, his secretary who countersigned and recorded it, the officer who recommended and the grantee who received it—has the means of obtaining all the information on the subject, and is bound to clear up all difficulties as they arise. The Government is a stranger to these matters. Its officers resist these claims, either because of their insufficient or conflicting evidence, of counter parol testimony, or, most satisfactory of all, as in this case, from a knowledge of the history of the country, and from a familiarity with the archives which deny the justice of the claim. It would be difficult, if not impossible, without a disclosure made by confederates in the plot, ever to discover the precise time and circumstances of the contrivance and execution of a scheme of forgery. But

as truth must be consistent in itself, and with all circumstances surrounding it, the establishment of any facts inconsistent with other assertions necessarily destroys all evidence in what is so asserted, no matter how bold or how solemn the statements.

[Counsel then proceeded to examine in detail the parol testimony in favor of the grant, but the argument could not be properly reported without a reprint of the record.]

Can any court, from this confused, perplexed, tangled, and self-destructive mass of assertions, conclude anything in favor of the grant? Does it not all but demonstrate that the claim is a fraud, and the evidence a fabrication? Does it not strongly impress the mind with a belief that the whole matter is a mere contrivance? Is it not entirely lacking in those qualities of clearness, simplicity, and coherence, which a truthful event, simply narrated, always presents?

But the grant is now to be submitted to tests much more satisfactory.

The testimony given by the Mexican archives exposes the whole deformity of the case. After the experience of this single case, the court will readily understand why the counsel for the United States below has been forced to abandon almost all reliance upon the parol testimony which abounds in these cases. No fact to establish the validity of a grant ever lacks a witness; seldom is any circumstance attested by one person, but another is found directly to contradict it. Witness after witness is then produced on either side, to sustain or impeach those preceding them, until the mind rejects all such testimony as bewildering, and seeks elsewhere for means of attaining legal certainty. Fortunately, there is a source whence impartial evidence can be obtained of a satisfactory nature. The old Spanish and Mexican archives now collected enable us, by proper and diligent examination, to speak with unfailing accuracy as to the character of the claims presented for confirmation. The counsel for Government has therefore, in the preparation of his cases below, seen fit to discard in a great measure the system of relying upon parol testimony, and to introduce in lieu thereof the habit of

consulting the archives, in whose disclosures he has much more confidence. Being equally accessible to both parties in these issues, the court has the further assurance, that an error or oversight committed by one, can always be readily corrected by the other.

But as the integrity and completeness of the archives have been challenged by the other side, and as these points have to be settled conclusively, at some time or other, by this tribunal, it is proper here to examine and vindicate their authority, both as to their original accuracy and their present condition. It can be clearly shown that the striking characteristic of the Spanish race, in its adherence to form and profusion of records, was retained by them in California, and pervades their public registries; and, also, that the present condition of the archives entitles them to respect.

[Counsel entered into a minute account of the manner and the places in which the archives of California had been formerly kept; the forms of authentication of laws, decrees, &c.; the mode of transmission from officer to officer, and of registration by each; the time and manner in which the public documents came into American possession, at and after the occupation of the United States forces in 1846; and especially all matters connected with the expedientes of land grants; the Toma de Razon (or Book of Registry) for the years 1844 and 1845; the journals of the Departmental Assembly; the uses and values of habilitated paper, and the various Government seals, whose forgery has been charged. It is impossible to report the argument in a compressed form.]

Now, to apply this test: Upon an examination of the archives, for the purposes of this case, it is shown:

1. That no expediente for this grant exists among the archives, where it certainly would have been at one time, had the grant been genuine. It is true that one witness, and he the former Secretary of State, is made to say, in an ex parte affidavit, "that it was the practice of the office to return the petition with the grant." Yet, in giving his testimony, upon his cross-examination, he corrects the error, and says what is true: that when an appli-

cation was made for a grant of land, the petition and balance of the expediente were always carefully archived, and never permitted to be withdrawn. Even without this correction, the court itself knows that this was the only course permitted by Mexican law and usage. A close search has also shown that every genuine grant for the year 1845 has its corresponding expediente properly on file; this alone has none.

2. The expediente is not only missing now from the archives, but we show that it never could have been there.

The expedientes are numbered on their covering sheets, and the numeration follows the order of the dates of the grants. Now, for the month of December, 1845, (the alleged date,) the expedientes are, as usual, continuously numbered; and for every grant (save this) bearing date in that month, its corresponding expediente exists in the archives. Now, as there is no expediente for this in the archives, and no gap in the numbering, there never could have been an expediente for it on file. This disposes of the supposition that the expediente might have been once archived, and afterwards lost; for, had this been the case, a blank would have been left in the numbering.

3. No explanation is given of the fact that the claimants have produced from their own possession papers in the usual form of an expediente. They have no business to be there; if they were genuine, they could not be there. It is just where they would be, however, if the contrivers of this case thought a manufactured expediente necessary to sustain a simulated grant. It is to be observed that General Vallejo, who asserts that he delivered the grant to Jose de la Rosa, is equally confident that no other papers accompanied the grant; how, then, did De la Rosa come by it? There is no explanation of this damaging fact.

4. The title by which Governor Pico styles himself in making the grant is entirely different from the one he used at the time of its date. Standing by itself, this would be but a small circumstance; but it weaves in with all the other circumstances making the woof of the fraud. It is just the blunder men would be apt to make in constructing an ante-dated docu-

ment. It is a mistake which an officer in the daily discharge of his functions would scarcely make.

5. There is no approval of the Departmental Assembly found among its records. Its journal is preserved, but there is no mention of this grant. Its evidence is not merely negative; on this point, it is positive and decisive. It shows that at the very time that it is alleged its approval was given, the Assembly was not even in session. A certificate, produced by the claimants, asserts that the grant was approved by the Assembly on the 11th December, 1845; but the journals show that, on the 8th of October, 1845, the Assembly suspended its session for the rest of the year, and did not reassemble until the 2d of March, 1846. This shows the fabrication of the certificate produced from the custody of the grantee. It is suggested that perhaps an extraordinary session had been held, at which this grant was confirmed, but of which no minute had been taken. Passing over the strange fact, that in such case this would be the only grant ever presented at an extraordinary session, and that all grants made about its date were presented at subsequent ordinary sessions, the effort fails entirely. The witness (Botello) called to prove that there might have been an extraordinary meeting, declined entirely to prove any such action at the meeting, if there was one; so the evidence amounts to a possible meeting and possible approval.

6. There is no minute or entry of this grant in the book of Toma de Razon (or Registry of Grants) for 1844, 1845. All other grants made within those two years are found recorded there; and had this been genuine, it would have been entered. The grant has the usual endorsement of " Queda Toma de Razon," or note that an entry had been made in this book, but it is not therein. The reason is, that the writers of the grant could put upon it any memorandum they pleased, but they had no access to the original registry, and could interpolate no entry in it.

Now, on these several points, the archives deny the grant; whilst, had it been genuine, upon some or all they would have surely testified in its favor. And they are dumb throughout;

the counsel for the Government undertakes to say, from his own knowledge of the archives, that in the whole two hundred volumes there is no mention of or allusion to this grant.

But, even beyond all this, the whole case is more strongly concluded by the next consideration.

The signature of Governor Pio Pico, and the seal of State to the grant, are both forged.

To facilitate the examination by the court of this part of the case, photographic copies of the documents were prepared and put in evidence below. They are now exhibited to the court, with perfect confidence that they will entirely dispose of the case. By the employment of the beautiful art of photography, this tribunal can examine the assailed title, and contrast it with papers of undoubted genuineness, with the same certainty as if all the originals were present, and with even more convenience and satisfaction.

As to the signatures.

From among the archives were selected all the signatures of Pio Pico which occur on the expedientes during the month in which it is claimed this grant was made. These were photographed upon one sheet in the order of their dates, and are now exhibited to the court. Their corresponding archive numbers are placed opposite to each, and it will be observed, as before stated, that there is no blank number, showing that all the expedientes of this date, which were ever numbered, are still in the archives. Upon the same sheet is photographed the signature to the grant in question. It has no corresponding expediente in the archives, and there is no number left for one. The court can now not only read the parol testimony understandingly, but can for itself contrast the genuine with the simulated signature.

[Counsel then pointed out the differences in the nature of the handwritings, the signatures and rubrics of Governor Pico, and contended it was physically impossible that one and the same person could have made the genuine and disputed signatures.]

The Government seal is forged.

There was a seal in the office of the Mexican Governor of

California, with a certain device, and the legend, "Gobierno del Dep'to. de Californias;" it was habitually used to authenticate papers issued from that office, and in the latter part of 1845 and in 1846 it was commonly applied to the sheets on which land grants were written. It is this seal of which the counterfeit is made. To exhibit this clearly, on another sheet are photographed several impressions of the genuine seal, grouped around a photograph of the assailed stamp. The principal witness for the claim, J. M. Covarrubias, the former Secretary of State, whose name appears in that capacity affixed to this paper, testifies that there was but one stamp or die ever used in the office. And herein he is undoubtedly correct. The court can now see for itself the essential differences between the impressions. Although, at first glance, there is a general resemblance between them, a few minutes close observation, a little patient training of the eye, will satisfy every one, as a plain matter of sense, that it is perfectly impossible the impression on this paper could have been made by the same stamp or die that produced the other and genuine impressions. Of course, there is but one conclusion.

[Counsel pointed out, upon the photographic sheets, more than twenty differences between the two classes of impressions.]

In order that there might be no objection to this novel mode of preparing the case for final hearing, the court will observe that these photographs are all matters in the record; the originals were given in evidence below, according to the strictest forms of law, and the copies filed as exhibits when parol evidence of these differences was given.

These photographs are now presented, that the members of the court may apply the evidence to them, and observe for themselves not only the differences pointed out, but others, that each eye will soon detect for itself.

Throwing aside all other objections, this last examination closes the case. Taken in connection with the examination of the archives, the matter stands thus. An alleged grant is produced, of which no evidence exists in the archives now, and which, it is demonstrated, never had any mention or

record in any of those public registries, where, had it been genuine, it must have been found. With the signature of the grantor forged, with the attesting seal of State forged, what can it avail the claimants, then, that men should have been found careless or reckless enough to swear to its genuinesss and validity, and to speak of their own connection with it as a cotemporaneous transaction? No matter how such evidence may be accumulated, it fails of its purpose. Whilst it may have the effect of shaking credence in human testimony, it cannot carry belief to any reasoning mind. But it may practically have one other effect, which is now respectfully submitted on the part of the Government. And that is, that scrutinizing the vast mass of testimony accumulated in this record, and its manifest refutal by incontrovertible facts, the court may adopt, as a canon, in passing upon these grants, that the fleeting impressions of official memory are not a safe reliance, and that to establish their validity some evidence drawn from the archives must be presented in their behalf.

Mr. Justice GRIER delivered the opinion of the court.

The appellants, Juan Manuel Luco and Jose Leandro Luco, filed their petition with the board of commissioners for ascertaining and settling land claims in California, on the 13th of September, 1854. This was after the time limited by the act of Congress of 1851. But, on their application, Congress passed a special act (July 17, 1854) authorizing the presentation of their claim.

They claim under a grant made to one Jose de la Rosa, dated 4th of December, 1845, and purporting to be signed by Pio Pico, as acting Governor, and countersigned by Jose Maria Covarrubias, secretary. This document was deposited in the surveyor general's office on the 25th of October, 1853, and had attached to it a paper, purporting to be a petition, by Jose de la Rosa to the Governor, setting forth that the Government was indebted to him in the sum of $4,650 for services as printer, and praying for the *sobrante*, or lands remaining between certain ranches of Vallejo and others.

The boundaries of the land prayed for are set forth very dis-

tinctly, but without any limitation as to the quantity of land contained therein. On the margin of this petition is the usual order for title, purporting to be signed by Pio Pico on 8th of November, 1845.

There is also attached a paper, purporting to be a certificate of approval by the Departmental Assembly, certified by the signatures of Pio Pico and Jose M. Covarrubias, and dated 18th of December, 1845.

This grant is for land within certain boundaries, and unrestricted as to quantity. Its confirmation was vigorously opposed by the counsel for the Government. They alleged that the documents produced to support the claim were forgeries, supported by perjuries of persons who had conspired to defraud the Government of an immense body of valuable land. Upon this issue the parties went to trial before the commissioners, who found in favor of the United States. The case went by appeal to the District Court, where much additional testimony was taken, a thorough investigation made, and these documents were again adjudged to be forgeries.

The appeal to this court compels us, however unpleasant the task may be, to pass upon this issue of fact, in which the character and conduct of others, besides the parties, will necessarily be made the subjects of discussion.

This claim first made its public appearance in 1853, after the lands had been surveyed by the United States Government as vacant. Previous to such survey, the public officers had used every diligence to discover whether any person possessed any title or claim to these lands, but the inhabitants of the district, and the owners of adjoining lands, were all ignorant of any claim, by possession, grant, or otherwise.

The lands within the boundaries of this alleged grant amount to 270,000 acres, or thereabouts.

The person to whom the grant purports to be made was almost a pauper, and though not actually a servant, yet a dependant of General Vallejo, residing in Sonoma, gaining a precarious livelihood by making and mending clothes and tin ware, acting as alcalde, printer, gardener, surveyor, music teacher, and attending to a grocery and billiard table for Val-

lejo; and during all this time, from the date till the public appearance of this title, wholly unaware of his wealth and immense possessions, and always representing himself as a poor man, while he had in his possession a title to 270,000 acres of valuable land.

The archives of the Mexican Government furnish not the slightest trace of any such grant; although all the other grants made in the same year and month, and on the same day, are carefully recorded and registered, and the expedientes found on file.

These facts might well justify the Government officers in questioning the authenticity of this grant, whatever the character and standing of the parties might be, who pretend to establish it by their testimony.

The claimants, in order to establish their title, examined Jose M. Covarrubias, who was secretary of the Governor, Pio Pico, at the time the grant purports to have been signed. He testifies that "it is in his handwriting, and the attestation is his signature; that he does not remember to have seen Pio Pico sign it; but that his signature appears to be genuine, and he believes he signed it."

We shall have occasion to notice the testimony of this witness more particularly hereafter. At present we only say, that there is no reason to doubt the truth of his statement, so far as he attests his own acts; but that he wrote and signed it on the day it bears date, needs confirmation; for, if it was so written and signed by him on that day, he should be able to give some reason why it does not appear on the register with the other grants made on the same day. It is true, he attempts to do this by alleging that he registered it in some other book not found in the archives, but he cannot give a reason why all other grants were on the book found, and this one alone in some unknown register. If it was so written and signed by him on the 4th of December, 1845, it is incumbent on the claimants to give some account of it—to show why it was kept secret till 1853. If in possession of the grantee, why it was not produced and laid before the commissioners; why the petition and marginal order forming part of the expediente, if

*Luco et al. v. United States.*

there was one, is found in the possession of the grantee; and where and when the certificate of approval was found and kept.

These and many other questions, which demand a solution, the claimants have not endeavored to answer. But they endeavor to prove—1st, that this grant was seen about the time. it bears date; and 2d, that Rosa had a ranch on this tract of land, with a stock of cattle and horses, and resided on it, for a time at least, with his wife and family, up to 1849, claiming it as his own.

The chief witnesses to establish these facts, besides numerous others, called to prove the possession, are Jose de la Rosa, Mariano G. Vallejo, and his brother, Salvador Vallejo. More than twenty witnesses have been called to prove that the character for veracity of these persons is so bad that they should not be believed on their oaths. As many testify to their good character, and especially to that Mariano G. Vallejo.

There is proof also of declarations of Rosa that Vallejo was indebted to him or his false swearing for the property he possesses: "That the only right way of swearing was by the priest, with the Catholic cross," and that "he was not afraid of the laws from the way the Americans swore witnesses."

Such testimony of admissions is of very little value, and is generally not worthy of regard; and the testimony as to character is so equally balanced, that we do not feel at liberty to reject any portion of it for that reason. There are many more satisfactory tests of the truth of parol testimony than that of character of the witnesses. Where the facts sworn to are capable of contradiction, they may be proved by others not to be true; and when they are not, the internal evidence. is often more convincing than any other. A shrewd witness, who is swearing falsely to something which cannot be disproved by direct testimony, will confine his recollection wholly to that single fact, professing a want of recollection of all the facts and circumstances attending it. An inexperienced witness, whose willingness to oblige his friend exceeds his judgment, will endeavor to give verisimilitude to his tale by a recital of imaginary circumstances. A stringent cross-examina-

tion will generally involve the latter in a web of contradictions, which will be in a measure evaded by the other, with the answer that he "*does not recollect.*" Where many witnesses are produced to the same facts, and they contradict one another in material circumstances, they prove themselves unworthy of credit.

It would be a tedious, and we believe an unnecessary task, to examine severally the testimony of the 120 witnesses examined in this case, and test their respective credibility on the principles we have stated. With the exception of a few remarks on the testimony of the witness already alluded to, we shall therefore content ourselves with stating the result of our examination, without an attempt to vindicate its correctness by exhibiting the process by which it has been attained.

Jose de la Rosa was called by the claimants, and examined. Having sold to the claimants without general warranty, he was a competent witness. He was the person who might elucidate and explain the many difficulties and suspicious circumstances connected with this transaction, if they were capable of explanation. But, instead of it, we find his examination in chief exceedingly brief. He is asked to prove the signatures of Pico and Covarrubias from his knowledge of their signatures. He is then asked if he ever had in his possession this grant, and when and where he received it. To which he answers, that "he received it from Don Mariano G. Vallejo, in Sonoma, in the latter part of December, 1845."

He is then asked if he ever had in his possession the certificate of approval, and when and where he received it. To which he answers, that it was delivered to him by Vallejo in the beginning of the year 1846.

With this meagre statement of matters, impossible to be contradicted except by Vallejo himself, the claimants conclude their examination in chief. The cross-examination fully confirms the wise caution of the claimant's counsel in not troubling the witness with too many questions.

When asked to explain his circumstances since 1846, he answers, that "he is rich; that his wealth consists in money at present; formerly in horses, cows, oxen, houses, and land, and

a house in Sonoma. Of mares and horses (he says) I have probably had five hundred, but not all at one time. From 1846 to 1847, I had 500 head of cattle; that in 1846 he had four hundred upon the rancho of Julpines." Now, all this has been proved by numerous witnesses to be utterly false. It would be tedious to notice all the absurdities and contradictions of himself, to be found in this cross-examination, as to the mode in which he has disposed of his wealth.

With regard to the existence of this grant, Mariano G. Vallejo testifies that he received it by a courier from the Governor, in December, 1845; that he handed it to Rosa, "*and he was much pleased.*" That this was the only paper received by him, *and that is all.* On cross-examination, he said he had seen the petition before he saw it on the files of the land office, but not the approval.

Again, in answer to another question, he denies ever having seen any paper but the grant at the time he received it, or afterwards, till he found the three papers connected together in the land office. In this he contradicts not only himself, but Rosa, who says he received the certificate of approval from him.

This testimony, instead of solving the difficulty as to the origin and history of this grant, leaves it in greater obscurity than it was before.

The testimony offered to prove the possession and improvements is so contradictory as to furnish material evidence of its untruth. One witness describes the house built by Rosa as made of poles; another declares that it was an adobe house, and that Rosa resided in it with his family; and as the house was near the Sacramento road, he had frequently seen them in it, and their cattle, horses, &c., on the land, up to the year 1849; another, that the house was more than eight leagues from the road. One says that he lent Rosa horses to convey his family to the rancho; another, that he took them in a boat; while Rosa himself ignores the boat, and swears he had horses of his own, and had no need to borrow, and that his family or himself had never resided anywhere but in the town of Sonoma, forty miles distant from the land—sometimes visiting his

rancho for two or three days. Another, after swearing to the fact of residence by Rosa and family on the land, admits, on cross-examination, that he never saw the land.

The testimony for the United States establishes beyond a doubt that the whole of this testimony is a mere fabrication; that Rosa never resided on the land; that he had no cattle or horses, but lived in the town of Sonoma, a dependant of General Vallejo; with difficulty gaining a precarious support from his numerous avocations; always declaring to the tax assessors that he had no real property, except a small lot in Sonoma, and no personalty beyond a cow and a horse.

Thus far the testimony produced by the claimants, instead of dispelling the suspicions attached to this grant, has only increased them—forcing on our minds the conviction that a grant attempted to be supported by perjury must necessarily itself be false.

The first public appearance of this claim, therefore, cannot be dated earlier than the 18th of March, 1853, when Jose de la Rosa makes his conveyance to the claimants, reciting this paper of 4th of December, 1845, for the alleged consideration of $15,000. This deed describes the land by boundaries, and is entirely silent as to quantity.

Now, we need not have recourse to the testimony of Rafael Guirado of the conversation overheard in the house of Vallejo between him and the claimants, and the alleged confessions of Vallejo with regard to this grant. Some doubts have been cast upon the character of this witness for veracity, and the testimony of such declarations and admissions is generally worthy of little reliance. Nevertheless, his story has an air of probability when connected with other evidence in the case, that forbids the conclusion that so great a simpleton as Guirado could ever have invented it.

The United States, in order to support this issue, are not bound to show by whom a scheme of fraud has been concocted, or how, when, and where, it was executed. It will be sufficient if they can show facts inconsistent with the allegation that the deed in contest existed on the day or year of its date. It is possible that the officers of the late Government

may execute grants since their power has ceased; and when called to prove their authenticity, may forget to mention the fact that their deeds are antedated. We regret to say that the testimony in this case justifies and demands this assertion.

Three facts tending to prove the authenticity of this grant are proved by claimants: 1st, that the petition *now* produced in connection with the grant was signed by Jose de la Rosa; 2d, that the marginal order on the same is in the handwriting of Covarrubias, the secretary, being the only instance in which he has been known to have acted as clerk to make such entry; 3d, the titulo and certificate of approval are in his handwriting, and signed by him.

Admitting these facts to be proved, we must inquire whether there is sufficient evidence to convince us that these documents were not executed at the time of their date, but some seven years thereafter.

I. We have already shown that this grant made its *first* public appearance in 1853, when it suddenly came forth, *as is alleged*, from the chest or pocket of Jose de la Rosa, and was immediately transferred to the claimants.

II. That the grantee himself, examined as a witness, can give no consistent or probable history of its origin, or why he had always lived in ignorance of it; or, if its existence was known to him, why he kept it a secret, or why a poor and garrulous old man should never mention it to friend or neighbor till about the date of its public appearance; or what possible motive could be found for a millionaire living as a pauper for so many years, and then disposing of his immense estate for a trifle.

III. We have shown also that the testimony of the witnesses called to prove a long possession and claim under this title is a tissue of falsehoods.

These facts alone would be sufficient to condemn this grant, and show that it had no existence before 1852; but if any doubts should still exist, that which remains to be stated will certainly dispel them.

IV. It is proved that the counsel to whom the claimants first made application for his services to obtain a confirmation

of this grant, on examination of the document presented to him as evidence of title, refused to be so employed, because the deed produced was a palpable forgery; that it was *not* the instrument *now* produced; that it had the signature of the secretary, Covarrubias, forged so badly that his name was twice misspelt in different ways, while the present is written by Covarrubias himself, and is consequently free from such blunders.

It has been argued that this testimony should be rejected as incompetent, because counsel has revealed the secrets of his client. To this it is answered, that the relation never existed, the counsel having refused to stand in that relation to the claimants. The right of privilege from examination was neither claimed by the counsel nor by the claimant, and the witness being examined without objection, we are not required to decide how far a counsellor who has been requested and refused to be a partaker with persons attempting to defraud the Government may plead his privilege, and refuse to answer. Having answered without objection, it cannot affect his credibility that he willing to expose a fraud under these circumstances. As a witness, his testimony is unimpeached and uncontradicted, and unwillingly confirmed by Covarrubias.

V. When the application was made to Congress, the petition and certificate of approval do not *appear to have been found,* and were not annexed to the grant till it appeared on file in the land office.

VI. There is no attempt to account for the fact that the petition, instead of being annexed to the expediente, is found in the hands of claimants, and not among the archives, where the expedientes of all the authentic grants made in that year are found. To account for this fact, Covarrubias, in his first affidavit, testified "that it was the practice of the office to return the petition with the grant." But when his deposition was taken, with cross-examination, he is forced to confess the untruth of the first statement, and admits, what is a well-known fact, that the petition formed part of the expediente always preserved on file among the archives.

VII. No trace of this grant is to be found among the archives of the Government; it is not found on the registry of

grants for that year, while authentic grants made in that year and month, and day of the month, are found on the files and registry.

VIII.. The seal on this paper differs from that found on authentic grants of the same date, and Covarrubias himself admits that there was but one seal used in the office while he was secretary. This seal, on careful examination by persons qualified to judge, is proved to be a forgery.

IX. The signature of Pio Pico and his rubric, when compared with a large number of his authentic signatures found in the archives, and those made on the same day in which the grant in question is dated, is found to differ in many particulars from that found on this paper. His official signatures are remarkable for their uniformity. Many excellent judges have carefully scrutinized and compared these signatures, and declare the signatures in question are forgeries. Two of them express the opinion that the person who wrote the body of the instruments made the signatures also.

We have ourselves been able to compare these signatures by means of photographic copies, and fully concur (from evidence "*oculis subjecta fidelibus*") that the seal and the signatures of Pico on this instrument are forgeries; and we are the more confirmed in this opinion by the testimony of Pico himself, found on the record. In a brief affidavit made on the 9th of June, 1853, he swears, without hesitation, that "the document bearing date December 4, 1845, was signed by him." But in his deposition taken in this cause on 27th of February, 1857, while this issue was pending, he appears to testify with very great caution. He seems to have drawn out a certain formula of words, on which it is clear that a conviction of perjury could never be sustained, whether his testimony was true or false. The answer is in these words, and three times repeated in the very same words:

"*I cannot now remember* in regard to the original document mentioned in said interrogatory, but the signature, as appears in the traced copy, *appears to be my signature,* and *I believe* it was placed there by me at the time the document bears date." His memory appears to be much weaker than his faith, as it

might have been supposed that such a sale of territory would have attracted his attention sufficiently to be remembered forever after.

X. This certificate of approval by the Departmental Assembly bears date at a time when the public records and minutes of that body show that it was not in session. It is dated on the 18th of December, 1845, and the resolution of approval appears to have passed on the 11th of the same month.

The records of the proceedings of the Assembly at the close of 1845, and beginning of 1846, are preserved. They show that on the 8th October, 1845—

"The *sessions* of the Assembly were suspended for the *rest of the year,* in consequence of permission having been granted to the Senores deputies, who reside out of this capital, to retire to the places of their residence, in view of the injuries they must suffer in consequence of their salaries due them respectively, as functionaries, not being paid."

A publication of the foregoing in all the pueblos of the Department was ordered to be made, October 11th, 1845.

The next session of the Assembly, as shown by its journals, was on the 2d March, 1846. The journals state that the Governor and certain deputies, who are named, had "assembled for the purpose of reopening the ordinary sessions, which, by a resolution of the body, had been suspended for the balance of last year. Whereupon the proceedings of the 8th day of October of the last year were read and approved," &c.

It is evident that no ordinary session of the Assembly was held on the 11th December, the day on which this grant is certified to have been approved.

It is contended, however, that extraordinary sessions were held, of which no record was kept, and the testimony of several witnesses has been taken to establish the fact.

But this attempt to supplement or falsify these records has wholly failed, and more especially as it appears that all the other grants admitted to be genuine, and which are of a date later than the adjournment, were presented and approved after the Assembly reassembled, on the 2d of March, 1846; and the form of words used in the certificate of approval of this one

differs from the eleven others, dated between November 22d, 1845, and December 19th, 1845.

In conclusion, we must say, that, after a careful examination of the testimony, we entertain no doubt that the title produced by the claimants is false and forged; and that, as an inference or corollary from the facts now brought to our notice, it may be received as a general rule of decision, that no grant of land purporting to have issued from the late Government of California should be received as genuine by the courts of the United States, unless it be found noted in the registers, or the expediénte, or some part of it, be found on file among the archives, where other and genuine grants of the same year are found; and that owing to the weakness of memory with regard to the dates of grants signed by them, the testimony of the late officers of that Government cannot be received to supply or contradict the public records, or establish a title of which there is no trace to be found in the public archives.

Let the judgment of the District Court be affirmed.