JOSEPH C. PALMER, CHARLES W. COOK, BETHUEL PHELPS, AND DEXTER R. WRIGHT, APPELLANTS, *v.* THE UNITED STATES.

An instrument of writing, purporting to be a grant of land in California by Pio Pico, in 1846, is not sustained by the authority of the public archives or in conformity with the regulations of 1828, and therefore comes within the previous decisions of this court, declaring such grants void.

Moreover, the evidence in the case shows that the alleged grant was utterly fraudulent.

THIS was an appeal from the District Court of the United States for the northern district of California.

The case is stated in the opinion of the court.

It was argued by *Mr. Benjamin* for the appellants, and by *Mr. Black* (Attorney General) for the United States.

The arguments consisted of comments upon the evidence in the case, which would not be interesting to the profession generally.

Mr. Justice GRIER delivered the opinion of the court.

The appellants claim the land in dispute as assignees of Benito Diaz. This claim was rejected by the board of land commissioners, and also by the District Court.

The documentary evidence, upon which the case rests, is as follows:

1. A petition of Benito Diaz, dated April 3, 1845, in which he asks for a grant of land which he calls "a vacant place within the jurisdiction of San Francisco, known by the name of 'Punta de Lobos,' bounded on the north by the sea, which flows to the port of San Francisco; on the south with the Cerro, in the rear of the mission known by the name of the 'Cerro de Laguna Honda;' on the east with the 'Loma Alta;' and on the west by 'la Punta de Lobos;' which will comprehend two leagues." The petition adds that the presidio and castle are within the tract, but the petitioner does not ask for them unless the Government is willing; but if that be done, he promises *to erect a house of certain dimensions in the port of San Francisco for the military command.*

2. An order of reference, bearing date May 24, 1845, and signed Pico, ordering the petition to pass for information to the respective judge, *and await the report of the military commander upon the matter.*

3. A report from Jose de la Cruz Sanches, who seems to have been alcalde at the pueblo of San Francisco, dated August 16, 1845, in which he declares that the land is vacant, and the petitioner has the necessary requisites according to law, *but declining to give any information about the military lands.*

4. A report by Francisco Sanches, the military commander, *dated at the military command of San Francisco,* October 18, 1845, setting forth that the land the petitioner solicits is vacant and

may be conceded to him, "*not comprehending in the grant the two military points of the castle and presidio that are included in the petition.*"

These documents are all written on the same paper. The Governor's order of reference is on the margin, and the reports endorsed. But there is no concession or order that a definitive title should issue to the petitioner, as is always found when the Governor accedes to the prayer of the petition. (See Arguello *v.* United States, 18 Howard, 543.)

The petition is not accompanied by a diseño or map of the land, as required by the regulations of 1828. This is all the document found among the archives or public records, and shows this fact only: that the petitioner asked for land; that the informè did not satisfy the Governor, who did not accede to the request, and therefore the petitioner took nothing by his application. That the Governor had good reasons for refusing the prayer of this petition, is apparent from the fact, not only of the public fortifications of the harbor being erected thereon, but because on the 4th of November, 1834, Governor Figueroa, in his decree establishing the puebla of San Francisco, had included a large portion of the land now claimed, and the remainder was claimed as the land of the Mission Dolores, which the Departmental Assembly afterwards (15th April, 1846) ordered to be sold at auction, and suspended the further alienation of the same as vacant.

This is all the record evidence, on which alone the court can rely as speaking the truth. It does not show even an inchoate equity in Benito Diaz; nor does the fact that he carried off some of the materials of the dilapidated fort to build him a house in San Francisco add to it.

The next fact which we can admit as sufficiently proved is, the sale by Benito Diaz of the land claimed to Thomas O. Larkin, in September, 1846, reciting a grant or patent to Diaz, dated 25th of June, 1846. This instrument purports to be a patent or definitive title to Benito Diaz, for all the land included in the boundaries mentioned in the petition. The public fortifications which protect the harbor of San Francisco are not excepted. The value of such a grant might easily be

anticipated, when the occupation of the country by the United States had taken place. Pio Pico, after his deposition from the government, could afford to be more liberal in 1846 than in 1845, when he very properly refused to make it. There is no trace of this grant to be found on record, or in the public archives. It purports to be signed by Pio Pico, and attested by his secretary, Moreno; and each of them has been called to attest the genuineness of the signatures. We have decided in the case of Luco *v.* United States, (23 How., 543,) "that, owing to the weakness of memory with regard to the *dates* of grants signed by them, the testimony of the late officers of the Mexican Government in California cannot be received to supply or contradict the public records, or establish a title of which there is no trace to be found in the public archives." In compliance with this rule, we might dismiss this case without further argument; for if the testimony of the officers of the Government cannot be relied on, much less can that of more obscure individuals, especially as we have seen in the Luco case, and some others, that it is easy to obtain any number of witnesses to depose to any fact necessary to establish a fraudulent grant.

The testimony brought in this case to support this private deed, and give it the force and effect of a public record, grant, or patent, and to prove that it was executed as such before the 7th of July, 1846, when the official functions of the late officers ceased entirely, tends only to confirm the suspicions in which it is involved, and demonstrate the necessity of the rule of decision which we have adopted.

Pio Pico was called as a witness. He swears "that he *believes* the signatures to be genuine," and that is all. He does not state *where* it was signed, or *when* it was signed, whether before or after his expulsion from the Government. If executed *where* it purports to be, viz: at Los Angeles, where the public records were kept, he knew it could be proved he had left Los Angeles a week before its date, (25th June,) and was residing at Santa Barbara, where he remained till the approach of Fremont to Monterey. He knew it could be proved that his secretary, who attested the paper, was in Los Angeles,

seventy miles distant. He could probably give no better reason for his willingness to sell the public forts, which he had refused to do a year before, than the fact that the Americans had taken possession of them. His silence on these points is expressive. There is no doubt that his testimony, so far as it goes, is true, and given with his habitual caution. He might excuse himself for not stating whether or not this grant was one of the large number said to have been executed by him on the 8th of August, on the eve of his departure to Mexico, for the reason that no question was asked him as to that fact.

Moreno, the secretary, is not so cautious, and therefore has involved himself in more difficulties, which are unexplained, and perhaps inexplicable.

He testifies as follows:

"I recollect this document. I saw *it on the 25th June, 1846,* when I signed it. This is my signature as secretary ad interim, and also my signature to the certificate of registry; and I saw Pio Pico sign it as Governor. This is his genuine signature. I think Benito Diaz wrote the body of the grant himself. After the grant was completed, I delivered it to the agent of Benito Diaz, on the road from Los Angeles to Santa Barbara. The agent to whom I delivered it, according to my recollection, was Eulogio Celiz."

Now, this document states that it was "given in the city of Los Angeles, on the 25th of June, 1846," and Moreno swears he saw Pio Pico sign it, who was on that day seventy miles distant in Santa Barbara. His certificate, that he has recorded it in the proper book, he does not prove to be true; or if he was at Santa Barbara, with Pico, on the 25th, how he could record it in Los Angeles, where alone the records were kept. If he executed and recorded it in Los Angeles, he does not explain why it is in the handwriting of Benito Diaz, and not drawn up by the clerks of the department as other grants; and how it came to pass that the date of the paper, and his certificate, are in the handwriting of Benito Diaz, who was at San Francisco, some five hundred and twenty miles distant; nor how it came to pass, that when he had signed and recorded this important document, he put it in his pocket, and started

for Santa Barbara, and met Celiz on the road; nor does he explain how Celiz, who left San Francisco on the 21st of June, with this paper drawn up by Diaz, for the purpose of taking it to Los Angeles to have it executed, could have taken it all the way to Los Angeles, five hundred and twenty miles, before it was executed; and then, that Moreno should meet him on the road between Santa Barbara and Los Angeles, *after* it was executed. There were no railroads in California at that time by which to account for such swift travelling.

Diaz testifies that the document is in his handwriting; "that he wrote it in San Francisco, on the 20th or 21st of June, in consequence of a letter which he received from Bandini, whom he calls secretary of the Government," but who was *not* secretary. "That the country was in such *a critical state*, that it was necessary to send it immediately; which he did, by special courier. That from information of his courier, Celiz, he understood that the grant was signed *on the road*, either at Santa Buena Ventura, or Santa Barbara." The critical state of the country, as the Americans were in possession of the greater part of it, will no doubt account for the fast riding of the courier, and in some measure for the execution of the deed on the highway, and the false certificate of record of a document which, without such recording, was but a private deed.

If Celiz met Pico where he states, he required but five days to ride five hundred miles, while it required eight days for Pico to travel less than seventy miles.

There is no necessity to rely upon the testimony of witnesses Crane and Watson, that Diaz declared, "that after the American revolution, he made out the grant in his own handwriting; and that, in order to make it valid, he dated it back to the month of June."

The face of the paper, and the testimony brought to support it, sufficiently demonstrate this to be the fact.

It is evident, that when this grant was fabricated, it was not known that conclusive evidence could be produced of the absence of Governor Pico from Los Angeles on the day of its

date.   Hence the necessity of changing the venue to that of the highway, when it was too late to alter or erase the certificate of record to suit it.   And hence the absurd contradictions exhibited in the testimony of Moreno, who appears to be emulating the example of his predecessor.

The judgment of the District Court is therefore affirmed, with costs.